UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL IMEL on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DC CONSTRUCTION SERVICES, INC., and DUSTIN CALHOUN, <br><br> Defendants. | Case No. 1:19-cv-00634-TWP-MG |

### ENTRY ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter is before the Court on a Motion for Partial Summary Judgment filed by Defendants DC Construction Services, Inc. ("DCS") and Dustin Calhoun ("Calhoun") (collectively, the "Defendants") (Filing No. 97), against Plaintiff Michael Imel ("Imel") on behalf of Himself and All Others Similarly Situated (collectively, "the Class" and the "Collective Class"). In response to Imel's claims for violation of the Indiana Wage Payment Statute, breach of contract, and conversion, (Filing No. 1), the Defendants move for partial summary judgment. For the following reasons, the Court **grants in part and denies in part** the Defendants' Motion.

### I.  BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Imel as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

DCS is a "commercial asphalt, concrete, paving, resurfacing, and striping company that operates throughout the State of Indiana," and is owned by Calhoun, a resident of Hamilton County, and president and sole owner-operator (Filing No. 31-1 at 1). DCS employs "anywhere

from 20 to 60 people at any given time," with some employees as "hourly employees who clock in and out via a timeclock at the main office or through a phone application," and "other employees [who] are paid on salary." *Id*. Between at least 2015 and 2018, Imel worked for the Defendants periodically for various lengths of time (Filing No. 29-1 at 1). He worked for DCS as an "asphalt superintendent," and was paid twenty-five dollars per hour for his work. *Id*. DCS paid Imel and the other hourly workers on a weekly basis. *Id*. Imel and his co-workers "routinely worked more than 40 hours in a week" for DCS. *Id*.

In September 2018, the Defendants and Imel entered into a loan agreement ("Loan Agreement") dated September 12, 2018 (Filing No. 1-1 at 1–2). The principal sum of the loan was for $9,000.00. In accordance with the terms of the Loan Agreement, Imel would have $150.00 deducted from his weekly paycheck. The Loan Agreement stated that if Imel was no longer employed by DCS, he agreed to forfeit "his last check to go towards the payoff of the loan," and would thereafter remain on the $150.00 per week repayment schedule. *Id*. at 1. The Loan Agreement applied to a "1999 F250 Super Duty Truck" (the "F250 Truck"), that was listed as "collateral." *Id*. at 2.

Imel worked the workweek of Saturday, September 15, 2018, to Friday, September 21, 2018 and—based on his weekly pay schedule—was to be paid for this work on September 28, 2018, (Filing No. 105 at 4). Imel worked 54 hours during that week. *Id*. The following week, he worked from Saturday, September 22, 2018, to Thursday, September 27, 2018, for a total of 48 hours. *Id*. at 5. The check for this workweek was to be paid on October 7, 2018. Imel averred that DCS did not pay him for the work completed for either of the two workweeks. *Id.*

On September 27, 2018, Imel was terminated from DCS by Calhoun (Filing No. 1 at 4). Calhoun terminated Imel "for poor performance and continuous legal issues which caused him to

miss work." (Filing No. 31-1 at 2.) On that same day, the F250 Truck was repossessed and towed from Imel's driveway by Miller's Towing and Transport, a company hired by the Defendants (Filing No. 105 at 5, 8).

On February 12, 2019, Imel filed suit against the Defendants raising individual and collective action claims for failure to properly pay wages and overtime wages in violation of the Fair Labor Standards Act ("FLSA"), the Indiana Wage Payment Statute ("WPS"), and the Indiana Wage Claims Statute ("WCS") (Filing No. 1 at 4–8). Imel also filed a claim for breach of contract and for conversion of the F250 Truck pursuant to the Indiana Crime Victims Relief Act ("CVRA"). *Id.* at 9–10. On June 1, 2020, Imel was granted conditional certification of a proposed collective action (Filing No. 48).

On November 12, 2021, the Defendants moved for partial summary judgment on Imel's WPS claims as well as his claims for breach of contract and conversion (Filing No. 97).

## II.   LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a

summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.  DISCUSSION

In his Complaint, Imel raises six claims alleging that the Defendants did not properly compensate him and other similarly situated workers at DCS for their proper wages and overtime pay in violation of the FLSA, WPS, and WCS, as well as claims pursuant to the CVRA and for breach of contract. (Filing No. 1.) The Defendants move for partial summary judgment on three of the six Counts, (Filing No. 97). The Defendants seeks judgment on Count II—a collective claim for "Failure to Properly Pay Wages Pursuant to the Wage Payment Statute, I.C. § 22-5-1 [sic] *et. seq.*"—because Imel and other employees were terminated by DCS and voluntary departure from employment is a condition precedent to maintain a WPS cause of action (*see* Filing No. 1 at 6;

4

Filing No. 98 at 1). The Defendants assert that Count V of the Complaint for "Breach of Contract," and Count VI for "Conversion of Truck Pursuant to the Crime Victims Relief Act, I.C. § 34-24-3-1," must also fail (Filing No. 98 at 2). The Defendants contend that judgment on these issues will "streamline and clarify the remaining issues for trial." *Id*.

Imel asserts that he and "the Opt-Ins/Plaintiffs have claims pursuant to the Wage Payment Statute which preclude dismissal." (Filing No. 106 at 2.) With respect to the breach of contract claim, he argues the Defendants were the first to breach and were "not in a position to enforce the Loan Agreement." *Id*. He maintains that his conversion claim for the F250 Truck is well-founded because he was not in default of the Loan Agreement and the Defendants' repossession of the F250 Truck was unlawful. *Id.*

The Court will address each argument in turn.

**A.** **Wage Payment Statute**

"The [WPS] governs both the frequency and amount an employer must pay its employee." *Naugle v. Beech Grove City Sch.*, 864 N.E.2d 1058, 1062–63 (Ind. 2007); *see also* Ind. Code §§ 22–2–5–1 through 22–2–5–3. Subsection 1(a) states, "[e]very person, firm, corporation, limited liability company, or association, their trustees, lessees, or receivers appointed by any court, doing business in Indiana, shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee." Ind. Code § 22-2-5-1. The statute has a "Ten-Day Rule" in subsection 1(b) and provides a requirement for the timing of the wage payment. *Id*. ("Payment shall be made for all wages earned to a date not more than ten (10) business days prior to the date of payment."). "An employer who fails to make payment of wages to any employee as provided in Indiana Code section 22-2-5-1 is subject to liquidated damages and attorney fees. I.C. § 22-2-5-2." *Naugle*, 864 N.E.2d at 1063.

The Defendants assert that Imel's WPS claims fail because he was terminated by DCS and the WPS only applies to employees who have voluntarily left employment or are still employed ([Filing No. 98 at 4](#)). The Defendants maintain that Imel admits in his Complaint and discovery responses that he was involuntarily terminated by DCS (*see* [Filing No. 1 at 34](#)). They contend that because Imel's employment was involuntarily terminated at the time of the filing of his claims, they are entitled to judgment in their favor on his WPS claim and they are entitled to judgment as a matter of law as to all collective action plaintiffs who were terminated ([Filing No. 98 at 7](#)). The Court agrees. *See Treat v. Tom Kelley Buick Pontiac GMC, Inc*., 646 F.3d 487, 490 (7th Cir. 2011) ("The language of the Indiana Code suggests, and the Indiana state courts have repeatedly confirmed, that the Payment Statute provides an avenue for relief to employees seeking unpaid wages who voluntarily leave their employment or who remain employed and whose wages are overdue. The Claims Statute, on the other hand, applies to employees seeking unpaid wages after their employer has fired them."). Imel does not dispute he is seeking alleged unpaid wages after he was involuntary terminated. His claim does not arise under the WPS.

The case law cited by the Defendants in support of their position—that Imel's WPS claims fail because his employment was involuntarily terminated at the time his claims were filed—is well-taken. The Defendants rely on *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 705 (Ind. 2002), to support their argument. In explaining the different categories of claimants which the WPS and the WCS applies to, the Supreme Court of Indiana held in *Steele*, "the Wage Payment Statute references current employees and those who have voluntarily left employment, either permanently or temporarily." *Id.* at 705. The Supreme Court of Indiana juxtaposed the WPS category of claimants with those under the WCS which referenced

"employees who have been separated from work by their employer and employees whose work has been suspended as a result of an industrial dispute." *Id*.; *see also* Ind. Code § 22-2-9-2.

Imel's argument that his wage claims and those of "the other Opt-Ins/Plaintiffs for regular wages and illegal deductions that accrued during the course of employment are actionable" under the WPS as a matter of law (*see* [Filing No. 106 at 10](#)) is unfounded. Imel concedes that he is bringing claims for unpaid wages after he was fired by DCS. However, he argues that "the employment status of an employee at the time that the wage claim accrues determines the appropriate Wage and Hour statute under which an Indiana employee must pursue his/her claim." *Id*. at 14. Imel provides no relevant case law or authority to support his conclusory analysis and it is in direct opposition to what this Court has found to be an appropriate determinant for which statute applies. *See Garrettt v. Aquatic Renovation Sys., Inc.*, No. 1:19-cv-01509-SEB-TAB, 2020 WL 1274996, at *4 (S.D. Ind. Mar. 17, 2020) ("[T]he critical inquiry in determining which of these two statutes governs is whether the employee left voluntarily or was terminated.").

Imel argues that the cases relied on by the Defendants are inapplicable because they do not address "a claim that arose during the course of employment and brought until after the employee is fired." *Id*. at 11. In a footnote in his brief, Imel points to *Harney v. Speedway SuperAmerica, LLC*, No. 1:05-cv-1912-LJM-WTL, 2007 WL 2710824, at *3 (S.D. Ind. Sept. 13, 2007), *aff'd*, 526 F.3d 1099 (7th Cir. 2008), which he claims analyzes "which Statute should apply to a wage claim that accrues during employment." ([Filing No. 106 at 11](#) n.2.) He also cites *Anderson v. Ne. Otolaryngology, P.C.*, No. 1:06-cv-0037-DFH-TAB, 2006 WL 2331142, at *1 (S.D. Ind. Aug. 10, 2006), *objections overruled*, No. 1:06-cv-0037-DFH-TAB, 2006 WL 3487333 (S.D. Ind. Dec. 1, 2006) in support of his contention. The Court finds Imel's reliance on *Harney* and *Anderson* misplaced.

7

In *Harney*, three store managers sued their former employer on behalf of themselves, and all others similarly situated, for claims under the WPS and WCS for alleged untimely and unpaid bonuses and wages. *See Harney*, 2007 WL 2710824 at *1. Imel refers to the dictum in *Harney* as support for his contention because the court concluded that bonuses received by two discharged managers while they were employed were governed by the WPS, *see id.* at *3 ("[T]hose bonuses that they did receive while still employed, but which were paid outside of the ten-day period, are governed by the Wage Payment Statute."). In *Anderson*, the issue was whether the plaintiff had filed her wage claims within the statute of limitations. *See* 2006 WL 2331142, at *2. The Seventh Circuit examined the unsuitability of both these cases with respect to the ambiguousness of the WPS and WCS to claims that arose both during employment and after firing. *See Treat*, 646 F.3d at 491–492. Like the Court determined in *Treat*, the *Anderson* case "sheds no light on the issue in this case," given it concerned whether plaintiff's wage claims were time-barred. *Id.* at 492. Regarding *Harney*, the Seventh Circuit determined that "more recent Indiana Court of Appeals decisions and the Indiana Supreme Court's decisions to deny review," better supported the prediction that the Indiana Supreme Court would find that a claimant could not recover under the WPS on claims for unpaid wages brought after they were fired. *Id*.

Federal courts must attempt to predict how the state supreme court would decide a question of law in absence of controlling precedent and in doing so, they are not bound by conflicting lower court precedents. *See Lewis v. Methodist Hosp.*, Inc., 326 F.3d 851, 856 (7th Cir. 2003) (citing *Allstate Ins. Co. v. Menards, Inc*., 285 F.3d 630, 632–33 (7th Cir. 2002)). The Defendants persuasively cite *Hollis v. Def. Sec. Co*., 941 N.E.2d 536 (Ind. Ct. App. 2011), wherein the Court of Appeals of Indiana concluded that the Indiana Supreme Court's reference to the "categories of claimants" in *Steele*, indicated that the "status of the employee at the time his or her claim is filed"

8

is the relevant inquiry in determining whether to proceed under the WPS or the WCS and not when the claim accrues. *Id.* at 540. Contrary to Imel's claim that appellate courts have not analyzed which statute applies to a wage claim that accrues during the course of employment, "in reviewing the relevant Indiana authority regarding whether the [WPS] or [WCS] applied to a plaintiff's claim, the Seventh Circuit has noted that both of these statutes, and questions about their application, have received substantial attention from the Indiana state courts." *Bragg v. Kittle's Home Furnishings, Inc.*, 52 N.E.3d 908, 915 (Ind. Ct. App. 2016) (internal quotation marks and citations omitted). The Court of Appeals of Indiana found "multiple appellate tribunals have considered whether the [WPS] or the [WCS] applies to a plaintiff's cause of action," and that each tribunal "makes it clear that an employee's status at the time he or she files the claim is the relevant inquiry in determining whether to proceed" under the WPS or WCS. *Id.* at 915.

Imel asserts that at the very least, the WPS claim should remain so the "Opt-Ins/Plaintiffs who quit their employment" with DCS are "permitted to argue that they are entitled to 200% of their minimum and overtime wages due and owing as liquidated damages pursuant to I.C. §22-2-5-2." (Filing No. 106 at 15.) The Court disagrees. Imel states in his response brief that the collective action is filing a "Motion to Amend Complaint to clarify its claims in this matter." *Id*. To date, no such motion has been filed. Ultimately, the Court finds no genuine issue of material fact in dispute as to the inapplicability of the WPS to Imel's wage claim or other discharged plaintiffs seeking to bring claims under that statute after they were involuntarily terminated.

Accordingly, the Court **grants** the Defendants summary judgment on Imel's wage claim pursuant to the WPS.

B.     **Breach of Contract Claim**

Imel asserts in his Complaint that he entered into a contract with the Defendants to "get money to purchase a truck" from them (Filing No. 1 at 4). He alleges that the Defendants breached the Loan Agreement by repossessing the F250 Truck and that he was damaged by the Defendants' breach of contract. *Id*. at 9. A breach of contract claim is founded on "the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). The parties do not dispute the existence of a contract.

The Defendants argue in their opening brief that Imel admits to not making any payments on the loan and in doing so, breached the Loan Agreement (Filing No. 98 at 9). They contend that they had a right to revoke the Loan Agreement and repossess the F250 Truck after Imel failed to make payments and it was within their contractual right to avoid taking a loss. *Id*. The Defendants assert that pursuant to the unambiguous terms of the Loan Agreement and existing case law, they had the right to revoke the contract and repossess the F250 Truck because Imel defaulted and failed to make payments. *See Bowers v. Anthem, Inc*., 473 F. Supp. 3d 848, 856 (S.D. Ind. 2020) ("Where terms of a contract are clear and unambiguous, courts will apply the plain and ordinary meaning of the terms and enforce the contract according to its express terms."). However, the Court finds several terms of the Loan Agreement are susceptible to ambiguity on its face and in implementing the contract.

Ambiguity in a contract can be one of two types: patent or latent. Patent ambiguity is "apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning." *Oxford Fin. Grp., Ltd. v. Evans*, 795 N.E.2d 1135, 1143 (Ind. Ct. App. 2003). Conversely, latent ambiguity

"rises only upon attempting to implement the contract." *Id.* at 1144. Patent ambiguities present pure questions of law, while latent ambiguities are resolved as questions of fact. *Felker v. Sw. Emergency Med. Serv., Inc.*, 521 F.Supp.2d 857, 867 (S.D. Ind. 2007). Extrinsic evidence is admissible to explain the meaning of a latent ambiguity but is not admissible to explain a patent ambiguity. *Id.*

>The "Payment," and "Prepayment" provisions of the Loan Agreement states,
>
>**Payment.** The principal amount of this Loan together with accrued and unpaid interest and all other charges, costs and expenses, is due and payable on or before each Friday of the week. All payments under this Agreement are applied first to accrued interest and then to the balance of the outstanding principal.
>
>**Prepayment.** The Borrower has the right to prepay all or any part of the principal amount of this Loan, together with accrued and unpaid interest thereon, at any time without prepayment penalty or premium of any kind. The payment will be deducted from Mr. Imels [sic] Paycheck, weekly of $150.00. IF [sic] Mr. Imel is not employed [sic], he agrees to forfit [sic] his last check to go towards the payoff of the loan. Mr. Imel will then, to continue to pay [sic] $150.00 / week until the loan is paid in full.

([Filing No. 1-1 at 1](#)) (emphasis in original).

On its face, the Loan Agreement is susceptible to patent ambiguity regarding the inconsistency of the language used for the amount that was due each week from Imel and there is inherent uncertainty regarding how such payments could be made. According to the "Payment" provision, $9,000.00 was due and payable by the Friday of each week, plus accrued interest. *Id*. This section of the Loan Agreement does not include language about the amount of the installment payments which both parties ostensibly agreed to. The "Prepayment" provision outlines an advance payment scheme of automatic deductions from Imel's paychecks, however, the language used presents an inherent uncertainty as to whether Imel could have chosen to forgo the automatic deductions in favor of making payments directly to the Defendants himself. These provisions convey a confused meaning regarding the amount and method of payment Imel was responsible

11

for each week. In implementing the "Payment" and "Prepayment" terms, there is also latent ambiguity given the uncertainty in determining how Imel could have proceeded with his installment payments, which would require extrinsic evidence. *See Walker v. Trailer Transit, Inc.*, 1 F. Supp. 3d 879, 884 (S.D. Ind. 2014), *aff'd in part*, 824 F.3d 688 (7th Cir. 2016) ("Where the meaning of the contract needs to be determined by extrinsic evidence due to a latent ambiguity, its construction is a matter for the fact-finder and the resolution of the issue is inappropriate for summary judgment.").

The Court has long recognized the abiding axiom that an ambiguous contract will be construed against its drafter. *See Falley v. Giles*, 29 Ind. 114, 115 (1867). The Court finds that while the Loan Agreement is ambiguous and uncertain in its terms, the meaning of the "Payment" and "Prepayment" provisions may well need to be determined by extrinsic evidence and its construction is a matter for the fact-finder. *See Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995) ("Rules of contract construction and extrinsic evidence need to be employed to determine and give effect to the parties' reasonable expectations. Under such circumstances, resolution of this issue is inappropriate for summary judgment.") (citation omitted).

Ambiguous terms aside, Imel makes several arguments about the Loan Agreement and breach (Filing No. 106 at 6–9). He argues that the Loan Agreement was not enforceable because the Defendants did not comply with the Indiana Wage Deduction Statute by having a signed wage assignment. *Id.* at 7; *see* Ind. Code § 22-2-6-2. Imel further asserts that the payment provision of the Loan Agreement—which forfeited his last check to go towards the principal balance if he was not employed—was void because it violated Ind. Code § 22-2-6-4. Finally, Imel argues that it was the Defendants that breached the Loan Agreement first by repossessing the F250 Truck before Imel defaulted (Filing No. 106 at 9).

"Generally, a contract made in violation of a statute is void." *Harbour v. Arelco, Inc.*, 678 N.E.2d 381, 385 (Ind. 1997). Imel argues that the wage assignment provision and the payment provision of the Loan Agreement were in violation of Indiana statute, to which the Defendants have not tendered a rebuttal. Imel's claim that the Defendants breached the Loan Agreement first has also not been directly contested. *See Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. Ct. App. 2011) ("A party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract."). However, the Defendants, in their opening brief, point to Imel's response to their interrogatories wherein he avers, "The [F250 Truck] was stolen from [Imel's] driveway prior to [Imel] being terminated. *Thus, no payments were made*.", as an admission that Imel breached the Loan Agreement first by making no payments ([Filing No. 99-2 at 6](Filing No. 99-2 at 6)) (emphasis added).

In considering a summary judgment motion, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017); *see also SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 369 (7th Cir. 2009) ("The non-moving party is entitled to have only reasonable inferences drawn in its favor."). Drawing reasonable inferences in Imel's favor, the Court finds there is a genuine dispute of material facts concerning the construction of the Loan Agreement, the enforceability of its provisions, and who breached its terms first. The Court determines that the ambiguity of the Loan Agreement terms, as well as the other material issues in dispute, present questions of fact which preclude summary judgment on Imel's breach of contract claim. Therefore, the Court **denies** the Defendants summary judgment of Imel's breach of contract claim in Count V of the Complaint.

### C. Conversion Claim

Pursuant to Indiana statute, "A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion." *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind. Ct. App. 2008) (citing Ind. Code § 35-43-4-3). Any person "who has suffered a pecuniary loss as a result of a criminal conversion may bring a civil action to recover the loss" under the CVRA. *Id.* (citation omitted). The same elements apply to both criminal and civil conversion, only the burden of proof is different. Thus, even in a civil action, "criminal intent is an essential element that must be proven." *Id.* (citation omitted). Generally, to prove conversion, "a plaintiff must show that: (1) the defendant's control over the property was unauthorized; and (2) the defendant was aware of a high probability that the control was unauthorized." *Young v. Smith*, No. 1:16-cv-03395-TWP-DML, 2017 WL 3581656, at *8 (S.D. Ind. Aug. 17, 2017) (citations omitted).

The Defendants argue that pursuant to the Loan Agreement, they retained a secured interest in the F250 Truck because it was collateral in the agreement, and they had a right to repossess the truck "at any time for multiple reasons including failure to make payments." (Filing No. 98 at 10.) The Defendants maintain that the language of the contract is "unambiguous," and "conclusive on the parties and on the Court." *Id.* at 11. They assert that when they repossessed the F250 Truck, they believed they were acting in complete compliance of the Loan Agreement terms and were unaware the seizure of the vehicle could be unauthorized. The Defendants contend that they were acting pursuant to self-help repossession provisions under Ind. Code § 26-1-9.1-609 and Imel never alleged there was a breach of the peace. *Id.*; *see* Ind. Code § 26-1-9.1-609(b).

Imel responds that the facts in evidence support a finding that the Defendants repossessed the F250 Truck prior to his defaulting on the Loan Agreement which amounts to conversion (Filing

14

No. 106 at 9). He contends that based on the work he completed for the workweek of Saturday, September 15, 2018, to Friday, September 21, 2018, the Defendants were required to pay him on Friday, September 28, 2018. *Id*. at 8. Imel asserts that he was fired on Thursday, September 27, 2018, before he had a chance to fulfill the payment terms of the Loan Agreement. He maintains that the Defendants subsequently kept his final two paychecks. *Id.* at 10.

Although the Court has determined that the Loan Agreement's terms were susceptible to ambiguity and the record contains a genuine dispute of material fact concerning which party was the first to breach, there is no evidence of criminal intent and no evidence that Defendants were aware of a high probability that the control was unauthorized. In any criminal conversion action, criminal intent is an essential element that must be proven. Sam & Mac, Inc. v. Tret, 783 N.E. 2d 760, 766 (Ind. Ct.App.2003). It is this *mens rea* requirement that differentiates criminal conversion from a more innocent breach of contract or failure to pay a debt, which situations the criminal conversion statute was not intended to cover. *Id*. To establish this element of the crime of conversion, a plaintiff must show the defendant was aware of a high probability his control over the plaintiff's property was unauthorized. *Manzon v. Stant Corp*., 138 F.Supp.2d 1110, 1116 (S.D.Ind.2001).Accordingly, the Court **grants** the Defendants summary judgment on Imel's conversion claim pursuant to the CVRA in Count VI.

## IV.   CONCLUSION

For the reasons discussed above, the Court **GRANTS in part and DENIES in part** the Defendants' Motion for Partial Summary Judgment (Filing No. 97). The Defendants are **granted** summary judgment on Imel's Wage Payment Statute claim and Conversion claim and Count II and Count VI are **dismissed**. The Defendants are **denied** summary judgment on Imel's claims for

Breach of Contract and Counts V may proceed beyond the summary judgment stage, along with Counts I, III and IV.

**SO ORDERED.**

Date: 2/1/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ronald E. Weldy
WELDY LAW
rweldy@weldylegal.com

Thomas W. Blessing
MASSILLAMANY JETER & CARSON
tom@mjcattorneys.com

Christopher Paul Jeter
MASSILLAMANY & JETER LLP
chris@mjcattorneys.com